UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW KETTMANN,<br><br>Plaintiff,<br><br>v.<br><br>JOSE URIBE and MARCNELL PALACIO,<br><br>Defendants. | Case No. 19-cv-07925-NC<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Re: ECF 66 |

In this civil rights case, Plaintiff Andrew Kettmann alleges that two San Jose Police Officers—Jose Uribe and Marcnell Palacio—used excessive force against him in a confrontation at an assisted living community. Officers Uribe and Palacio tased Kettmann twenty times and struck him with a baton several times, fracturing his leg. Kettmann claims that the Officers' actions violated federal and state civil rights laws.

Defendants move for summary judgment on both of Kettmann's claims and on their qualified immunity affirmative defense. Having carefully considered the briefing and all admissible evidence, the Court GRANTS the Defendants' motion.

**I. BACKGROUND**

The following facts are viewed in the light most favorable to Kettmann, the non-

movant, and are undisputed unless otherwise indicated. Kettmann has been diagnosed with schizophrenia and bipolar disorder. ECF 54 at ¶ 16. These disabilities have prevented him from caring for himself, and a state court ordered him conserved at the age of eighteen. *Id*. Kettmann had been a resident of the Riviera Villa Therapeutic Living Center—an assisted living community for individuals with mental health disorders—for at least three weeks prior to the incident. ECF 66-3 at ¶¶ 2, 4.

On December 3, 2017, a Riviera Villa employee called 9-1-1 to report that Kettmann had been acting "violently and erratically," allegedly threatening Riviera Villa staff members and swinging his fist at, slapping, and exposing himself to other residents. *Id*. at ¶¶ 5-8. After the employee asked for police assistance, Kettmann threatened to kill her and pushed her into a door; she then hid in a nearby room. *Id*. at ¶¶ 8-9. When SJPD officers initially arrived, Kettmann had left the area. *Id*. at ¶ 11. Several officers, including Officer Palacio, were present during this initial response, but Officer Palacio did not enter the facility at this time. ECF 66-1 at ¶ 3. The employee was unsure whether she could press charges without management approval, so the Officers left without taking further action. ECF 66-3 at ¶ 12. After the Officers had departed, Kettmann returned to the Riviera Villa grounds. *Id*. at ¶ 13. The employee instructed residents to return to their homes out of fear that he would resume his assaultive behavior. *Id*. She called 9-1-1 again to request that SJPD return and arrest Kettmann. *Id*. at ¶ 15.

This time, Officers Palacio and Uribe responded to the call. ECF 66-1 at ¶¶ 5-6. Officer Uribe entered the facility to speak with the employee while Officer Palacio waited outside. *Id*. at ¶ 6. The employee told Officer Uribe that Kettmann had assaulted her and acted threateningly toward other residents. ECF 66-2 at ¶ 5. While Officer Uribe was inside, Officer Palacio asked other residents to point out Kettmann. ECF 66-1 at ¶ 7. With this insight, Officer Palacio spotted Kettmann walking nearby, approached him, and asked him to "hang out here for me;" Kettmann ignored this request and kept walking. *Id*. Officer Palacio then instructed him to sit in a nearby chair; Kettmann continued to ignore him. *Id*. Officer Palacio waited for Officer Uribe to return before attempting further

2

contact. *Id*. After finishing his conversation with the employee, Officer Uribe informed Officer Palacio that there was probable cause to arrest Kettmann. *Id*. at ¶ 9. Both Officers then approached Kettmann to attempt the arrest. *Id*. at ¶ 10.

Officers Uribe and Palacio grabbed Kettmann's arms in order to handcuff him. *Id*. at ¶ 11. Kettmann reacted by breaking away from the Officers' grasps. ECF 66-2 at ¶ 10. Officer Palacio warned Kettmann that he would be tased if he did not follow instructions. *Id*. at ¶ 11. Kettmann then attempted to reach for Officer Palacio's taser and struck him in the face. *Id*. Officer Uribe tried to maintain control of Kettmann by holding onto his sweater, but Kettmann pulled and ripped Officer Uribe's jacket in an attempt to take him to the ground. *Id*. at ¶ 12. Kettmann slipped out of his sweater and away from the Officers' grasps before cursing at them and attempting to scale a fence to escape. *Id*. at ¶ 13-14. Unable to climb the fence, Kettmann turned back towards the Officers and squared his body in a fighting stance. *Id*. at 15. At this point, Officer Uribe tased Kettmann, causing him to fall to the ground. *Id*. at 16.

Once Kettmann was on the ground, the Officers instructed him to roll onto his stomach so they could handcuff him. ECF 66-1 at ¶ 19. However, Kettmann continued to resist by kicking at the officers, attempting to grab Officer Palacio's baton, remove the prongs of the taser from his body, and stand to his feet. *Id*. at ¶¶ 18-19. Each time Kettmann attempted to stand up, remove the taser prongs, or kick at Officer Palacio, Officer Uribe tased him. ECF 66-2 at ¶ 22. Although Officer Uribe ultimately activated his taser twenty times, only the first four or five applications had any effect on Kettmann because at some point, one of the wires dislodged from the barb attached to Kettmann and negated the full effect of the taser's electric shock. ECF 66-4 at ¶ 22-23.

After twenty tases, SJPD backup arrived. ECF 66-1 at ¶ 21. Seeing that the taser had become ineffective, Officer Palacio began to strike Kettmann's legs with his baton. *Id*. at 22. Officer Palacio claims to have used his baton five to eight times, each time in response to Kettmann's attempts to strike an officer or stand up. *Id*. During the struggle, Kettmann kicked an officer in the chest and caused another officer an eye injury. *Id*. Eventually, the

3

officers managed to turn Kettmann onto his stomach and handcuff him. *Id*. at ¶ 23.

**A. Procedural History**

Kettmann filed his initial complaint on December 3, 2019, alleging six causes of action: (1) 42 U.S.C. § 1983 excessive force against San Jose Police Officer Does 1-50; (2) § 1983 excessive force against the City of San Jose via a *Monell* theory of liability; (3) intentional infliction of emotional distress; (4) Bane Act excessive force; (5) violation of the Americans With Disabilities Act against the City of San Jose; and (6) violation of Section 504 of the Rehabilitation Act against the City of San Jose. ECF 1. On March 9, 2020, Defendants moved to dismiss the *Monell*, ADA, Rehabilitation Act, and IIED claims. ECF 24. On April 20, 2020, the Court dismissed the Rehabilitation Act and IIED claims, but denied the motion as to the *Monell* and ADA claims. ECF 29. On May 15, 2020, Kettmann filed his first amended complaint dropping the IIED claim, but otherwise alleging the same claims against the same parties as the initial complaint. *Id*.

On January 28, 2021, Kettmann moved for leave to file a second amended complaint to add the individual officers involved in the incident as defendants. ECF 51. Despite the untimeliness of the motion, the Court granted Kettmann leave to file a SAC in light of counsel's excusable neglect. *Id*. Kettmann filed his SAC on February 22, 2021, removing Does 1-50 and adding Officers Uribe and Palacio as defendants. ECF 54.

On July 1, 2021, the parties stipulated to dismiss all claims against the City of San Jose. *See* ECF 72. Accordingly, the two claims that remain before the Court are claims of excessive force under § 1983 and the Bane Act against Officers Uribe and Palacio. *See id.* All parties have consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c). ECF 9; ECF 18; ECF 62; ECF 63.

**II. LEGAL STANDARD**

Summary judgment may be granted only when, drawing all inferences and resolving all doubts in favor of the nonmoving party, there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a); *Tolan v. Cotton*, 572 U.S. 650, 651 (2014); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under governing

4

substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Bald assertions that genuine issues of material fact exist are insufficient. *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).

The moving party bears the burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings, and, by its own affidavits or discovery, set forth specific facts showing that a genuine issue of fact exists for trial. Fed. R. Civ. P. 56(c); *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1004 (9th Cir. 1990) (citing *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983)). All justifiable inferences, however, must be drawn in the light most favorable to the nonmoving party. *Tolan*, 572 U.S. 651 (citing *Liberty Lobby*, 477 U.S. at 255).

It is not the task of the Court, however, to "scour the record in search of a genuine issue of triable fact." *See Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal citations omitted); *see also Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) ("The district court need not examine the entire file for evidence establishing a genuine issue of fact."). Courts rely on the nonmoving party to identify "with reasonable particularity the evidence that precludes summary judgment." *See Keenan*, 91 F.3d at 1279. If the nonmovant does not meet this burden of production, the Court may consider its claims to be waived. *See id.*; *see also Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007) ("Generally, the federal courts deem waived any arguments that are not raised and presented in the parties' opening briefs.").

### III. DISUCSSION

#### A. Excessive Force

To determine whether force used was "reasonable" under the Fourth Amendment, a

court must carefully balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989). This analysis requires "careful attention to the facts and circumstances of each particular case," including: (1) the "severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) whether the suspect is "actively resisting arrest or attempting to evade arrest by flight." *Id*. (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)). In weighing these factors, the "'reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)).

The Court first considers the nature and quality of the intrusion, or the "type and amount of force" that the Officers used on Kettmann. *See Bryan v. MacPherson*, 630 F.3d 805, 824 (9th Cir. 2010). A taser used in dart mode—as here—is a "greater intrusion" than other types of non-lethal force and must be justified by the governmental interest involved. *Id*. at 825-26. Baton strikes present a similarly significant intrusion. *See, e.g., Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011) ("[B]aton blows are. . . capable of inflicting significant pain and causing serious injury."). Because the force used was significant, the Court now turns to the *Graham* factors to balance the Fourth Amendment intrusion against the governmental interests at stake.

First, the Court must analyze the severity of the crime at issue. *See Graham*, 490 U.S. at 396. Defendants claim that the Officers were attempting to arrest Kettmann for assault, a violent crime, at the time of the incident. ECF 66 at 9. In his opposition, Kettmann does not point to any genuine dispute as to whether he did in fact commit this crime. Thus, even when viewing the evidence in the light most favorable to Kettmann, the first *Graham* factor weighs in Defendants' favor.

Second, the Court must investigate whether Kettmann posed an immediate threat to the safety of the Officers or others. *See Graham*, 490 U.S. at 396. The Ninth Circuit has found this factor to be the "most important." *Bryan*, 630 F.3d at 826 (quoting *Chew v.*

6

*Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994)). Defendants list myriad reasons why Kettmann posed a threat before the first taser strike: he assaulted two people, threatened a staff member, returned to the scene of the assaults, ignored Officers' directions to sit, reached for Officer Palacio's taser, slapped and pushed Officer Palacio, grabbed onto and ripped Officer Uribe's jacket, cursed and screamed "menacingly" at the officers, and squared off in a "fighting stance." ECF 66 at 10. Defendants argue that Kettmann continued to pose a threat after the first strike, even while he was on the ground: he kicked and spit at officers, attempted to grab Officer Palacio's baton, tried to remove the taser prongs, and attempted to stand to his feet. *Id*. at 10-11. Defendants argue that if Kettmann had been able to stand up, they may have needed to use deadly force to control him. *Id*. at 11.

As with the first factor, Kettmann makes no attempt to address these arguments in his opposition. Rather than pointing to a genuine dispute of fact, Kettmann only offers the conclusory statement that, "there is no evidence that [Kettmann] was an immediate threat, therefore the force used was unreasonable." ECF 67 at 10. Since the opposition fails to "set forth specific facts showing that a genuine issue of fact exists," the second *Graham* factor also weighs in Defendants' favor. *See* Fed. R. Civ. P. 56(c); *Keenan*, 91 F.3d at 1279; *Outdoor Media Group*, 506 F.3d at 900.

Third, the Court must examine whether Kettmann was resisting arrest or attempting to flee at the time the officers used force. *See Graham*, 490 U.S. at 396. Defendants argue that Kettmann actively resisted throughout his encounter with the Officers by ignoring instructions, slipping out of his sweatshirt to escape the Officers' grasps, and attempting to scale a fence to flee. ECF 66 at 11. In his opposition, Kettmann again makes no attempt to dispute these facts. Viewing the evidence in the light most favorable to Kettmann, the third *Graham* factor also weighs in Defendants' favor.

The reasonableness evaluation is a balancing test that requires an in-depth, fact-specific analysis, and is not necessarily limited to a consideration of only these three factors. *See Graham*, 490 U.S. at 396. Defendants identify two additional factors that support their use of force: (1) the Officers provided multiple warnings before they struck

Kettmann with a taser or baton; and (2) Kettmann's mental disturbance gave the Officers an even greater reason to believe Kettmann posed an immediate threat. ECF 66 at 11-12. The opposition again makes little effort to address these arguments. Kettmann points to Ninth Circuit caselaw for the proposition that an encounter between police and a person suffering from mental illness creating a disturbance warrants less force than a "dangerous criminal." ECF 67 at 7. This is true. *See, e.g., Glenn v. Washington Cnty.*, 673 F.3d 864, 876 (9th Cir. 2011) ("[W]hen dealing with an emotionally disturbed individual who is creating a disturbance or resisting arrest, as opposed to a dangerous criminal, officers typically use less forceful tactics."); *Deorle v. Rutherford,* 272 F.3d 1272, 1283 (9th Cir. 2001) ("[T]he governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual."). But Kettmann points to no evidence indicating that he was indeed creating a disturbance and not committing a crime. Kettmann also fails to argue how his mental illness fits into the *Graham* reasonableness analysis. Standing alone, Kettmann's mental illness does not create a genuine dispute as to any material fact in the record.

In sum, all three *Graham* factors weigh in favor of Defendants. Although the factors are not exclusive, Kettmann fails to present a cogent argument as to how additional considerations would affect the reasonableness inquiry. Because Kettmann does not raise a genuine dispute as to any material fact, the Court must find the Officers' use of force objectively reasonable.

**B. Qualified Immunity**

Defendants also argue that Officers Palacio and Uribe are entitled to the defense of qualified immunity, even if their use of taser and baton strikes constituted unreasonable force. ECF 66 at 14. Qualified immunity protects "government officials...from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Whether an official is entitled to qualified immunity

8

turns on whether their action was objectively reasonable, considering the clearly established legal rules at the time. *See Anderson v. Creighton*, 483 U.S. 635, 639 (1987). Courts look to "Supreme Court and Ninth Circuit law existing at the time of the alleged act" to determine whether a right was clearly established. *Community House, Inc. v. Bieter*, 623 F.3d 945, 967 (9th Cir. 2010). In the absence of binding precedent, courts may also look to decisions from other circuits and district courts. *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996). "The relevant, dispositive inquiry. . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Norwood v. Vance*, 591 F.3d 1062, 1068 (9th Cir. 2010) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

Kettmann points to one Ninth Circuit case to show that the Officers violated a clearly established right. In *Jones v. Las Vegas Metro. Police Dep't*, multiple officers simultaneously and continuously tased Jones for over ninety seconds *after* Jones was handcuffed, on the ground, and physically subdued. 873 F.3d 1123, 1127 (9th Cir. 2017). Jones was pronounced dead shortly thereafter. *Id*. The court held that "any reasonable officer would have known that such [taser] use can only be justified by an immediate or significant risk of seriously injury or death to officers or the public," and thus that summary judgment as to qualified immunity was inappropriate. *Id*. at 1132.

Without identifying additional facts to demonstrate a genuine dispute, Kettmann's reliance on *Jones* is unpersuasive. This case is distinguishable because, unlike in *Jones*, Officers Palacio and Uribe ceased their taser and baton strikes once backup officers subdued Kettmann. The undisputed facts also show that most of the taser strikes had only a minor effect, if any, on Kettmann.

Because Kettmann did not meet his burden of showing a violation of a "clearly established" right, the Court grants summary judgment as to the defense of qualified immunity.

**C. Bane Act**

The elements of a § 1983 excessive force claim and a Bane Act claim are the same,

9

apart from the additional "specific intent" requirement under the Bane Act. *See Cameron v. Craig*, 713 F.3d 1012, 1022 (9th Cir. 2013). Here, beyond the deficiencies in the federal claim described above, Kettmann has also failed to cite to "particular parts of materials in the record" to show that the Officers had a "specific intent" to violate his rights. *See* Fed. R. Civ. P. 56(c). Simply instructing the Court to view the body-worn camera footage is insufficient. *See Keenan*, 91 F.3d at 1279.

Accordingly, the Court also grants summary judgment as to the Bane Act claim.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED as to all claims.

**IT IS SO ORDERED.**

Dated: July 7, 2021

_____

NATHANAEL M. COUSINS

United States Magistrate Judge